Good morning, we will call the case of Wilkinson v. Attorney General USA 21-3166. Counsel, is it Lempel? Yes. Good morning, Mr. Lempel. Good morning. May it please the Court. My name is Jesse Lempel for the petitioner, C.T. Wilkinson. Mr. Wilkinson is present in the courtroom today, and I'd like to reserve two minutes for rebuttal. Sure. The facts found by the immigration judge show that Mr. Wilkinson's removal would result in exceptional hardship to his seven-year-old son, Messiah. Those established facts are well beyond what is normally expected to happen when a non-citizen is deported. How are they well beyond? Well, I think in a typical case where a father is deported and a U.S. citizen child stays in this country, you'd expect some adversity for the child. What you would not normally expect is that the child has severe medical and psychological vulnerabilities in an unstable home without the typical support systems to fall back on. Specifically, you would not normally expect that the child is hospitalized five times a year with a serious medical condition. Our review is supposed to be deferential here, right? Let's talk about the standard of review. Yeah. The Supreme Court didn't tell us what standard of review. Our other circuits don't seem to have adopted a standard of review. Which deferential standard of review and why? So we think it's abusive discretion. The Supreme Court's case in Monaskey says that it's very difficult to reason toward the correct standard of review from first principles. So the best guide is when you have a history of appellate practice. So I think it's standard of review, and that's what we have here. I think it's undisputed. How do we understand why abusive discretion would work here? Because what we're looking at is applying legal principles to a factual determination. That doesn't usually lend itself to an abusive discretion standard, does it? It does, I think. The Supreme Court has said in the McLean case, McLean v. EEO, that abusive discretion is a term of art. So sometimes it refers to when there's discretion and you have to figure out, did the decision maker exercise discretion appropriately? But other times, it just refers to a deferential standard of review that's selected for functional reasons. The initial decision maker is best positioned to make the decision, and the appellate court essentially defers to it in some way, but it's certainly not advocating judicial review. No one is advocating clear error review, even though this mostly looks like a factual issue. Your main reason for this is that it used to be abusive discretion. That's not the main reason. I think there's a bunch of reasons that all coalesce. The first one is the history, and I think that's very important. The Supreme Court said that's the first thing you look to. The second is that if you look at other cases where the Supreme Court has applied abusive discretion, I'm thinking particularly of the exceptional case determination in the Patent Act. It's the Highmark Supreme Court case. It's very similar. There's an exceptional case. The Supreme Court said it's primarily factual, and yet it selected abusive discretion. I do want to say that I don't think it ultimately matters if we select abusive discretion or substantial evidence, because I think this court could write an opinion saying that we need not decide whether it's substantial evidence or abusive discretion. Either way, I.J.'s decision is arbitrary. But why is it arbitrary? Because there's clearly some hardship. The issue is whether or not the hardship here rises to the level that would be sufficient to get him relieved. Why is that arbitrary? I think it's arbitrary because it conflicts with the BIA's established case law, the BIA's own cases. That's the easiest way to get to an arbitrariness finding here. If you look at – I'm thinking particularly of the unpublished decisions that we cited in our addendum. We have a bunch of them, and they're pretty much on all fours. Well, in some of those opinions, there was testimony from child psychiatrists, therapists, et cetera. Do we have that in this record? We don't have that. I don't think that's an important distinction. And if anything, I think it cuts in our direction. So let me just unpack that for a second. Unpublished decisions aren't binding, and we've made it – Sengu Park, it's – we've never found a case in which there was such a pattern of unpublished decisions that the agency effectively bound itself to a certain rule. Why should this be the very first such case? I don't think I'm asking for the park rule to be applied here. The park rule is about a case where the agency does have discretion, and it limits itself to – it limits its own discretion through unpublished decisions. And that – your Honor is correct that this court has never found that rule to apply. This court has found that when the agency, in an unpublished decision, treats a set of facts in one way, it cannot just go in a different decision and treat this materially indistinguishable set of facts a different way without reasonable explanation. That's the Shardar case. So the Shardar case was – that was not a discretionary decision like here. That was – the Shardar case was about – it was about, I think, changed country conditions for asylum. And they said, oh, there's an unpublished decision on material indistinguishable facts that went one way. You can't just go the other way without at least giving a reasonable explanation. So we don't have that here. So that, I think, is the easiest way, Judge McKee, to get to an arbitrary finding here. But back me up for a minute. I asked you about the testimony or lack thereof. Yeah, so let me get back to that. How does that help you? How does it help us? So it helps us because Messiah doesn't have access to psychological care. The first step to being diagnosed or to being – having some kind of testimony on your behalf by a psychologist is when you're able to access that care. One of the factors aggravating Messiah's hardship here and accentuating his hardship is that he doesn't even have access to psychological counseling, even though his teacher is texting his mother saying he needs this – he needs this. He had insurance, right? He has insurance. Yeah. Has insurance, yeah. So I don't know – it's not on the record if the insurance would cover psychological care in this instance. But either way, the mother has refused. That's the – those are the facts here. So Messiah did not have access to psychological care, which – Are you saying the mother refused this sort of intervention? She did. She – Mr. Wilkinson thought it was – thought – the teacher was texting the mother saying he needs this care. Mr. Wilkinson, who was then detained, said, yes, he does need this care, but he was detained. He had limited ability to influence that. And the mother said, I don't think it's a good idea for him to be speaking to people we don't really know. And she didn't think it was appropriate. But, you know, there's this fundamental problem. Mr. Wilkinson has not been the custodial parent, has not been living with him. And so, you know, in these circumstances, the IGA reasonably finds there's – it's not obvious that removing him causes exceptional, extremely unusual hardship of the sort that happens when you take a custodial parent away or something like that. Well, two things on that point. First of all, if you look at the RMNN decision, which is tab two of our addendum, it's a very similar circumstances where the father was – had a close relationship, saw him every weekend. It's not the custodial parent, but it's almost identical circumstances. Well, that's much more frequent in this case, correct? No, it's every weekend in this case. And in this case, it's even more frequent, I would say, because the record shows that the mother – she has her own mental health issues. She suffers from depression that makes her unable to parent Messiah for days at a time each month. In those days, she drops Messiah off with her mom or her grandmother, and Mr. Wilkinson would step up and be the only parent present for Messiah, looking after Messiah in those days. So Mr. Wilkinson was very involved in Messiah's life. And I would also add one more thing about that, which is that he was not the custodial parent after the – he lived – the family lived together until Messiah was two years old. Then, for financial reasons, because Mr. Wilkinson was the sole provider, and he could not take care of Messiah and do – and support the family at the same time, that's why they split up, and that's why, you know, they moved just across the border. They didn't move that far away. And every weekend, Mr. Wilkinson would take the train, take the bus back to Messiah and take care of the child. And he supported the child financially, completely. He's the only provider, because the mother doesn't work, in large part due to her mental health issues. The immigration judge did not – I think he agreed the immigration judge, even given his or her – I think it's a his here – his determination in terms of the level of hardship did not – and whether or not there's a legal satisfaction of the four criteria, did not go to the second step that Sotomayor talks about, and exercise discretion as to whether or not, nevertheless, despite not qualifying at the first of those four levels, that he, the IJ, was going to exercise favorable discretion and grant cancellation of removal. Is that right? That's right. So the issue before this court is not the ultimate grant of cancellation. Could the IJ do that on remand? Yes. I mean, what we'd ask this court to do is correct the mistake about eligibility. So the issue before this court is whether Mr. Wilkinson even gets a shot at that cancellation, at that relief, if he's even eligible for that relief. So we'd ask the court to correct the IJ's mistake on the eligibility finding, and then remand for the IJ to exercise its discretion in the first instance, whether he gets the relief. So whether he's eligible is a question of law. That's the Supreme Court's holding. That turns upon a factual finding, though, right? The eligibility. Eligibility is the application – it's a question of law. It's the application of the legal standard to the facts. So it turns on findings of fact. It turns on findings of fact, but the findings of fact are not disputed here. I'm sorry. Say it again, please. The findings of fact are not disputed here. Well, what the findings of fact amount to, that's in dispute, and you're saying that's where the legal determination comes in. Yes. It's the application of the legal standard. It's whether those established facts are what is normally expected to happen when a noncitizen is deported, or if they're substantially beyond that. So assuming we agree with you and we send it back, it would be on a closed record on these facts. Yeah. If you agree with me that – well, I think that on the record for the ultimate discretionary decision, it's possible that hasn't been – the IJ never reached that decision. I don't know if the IJ – I assume the IJ – But on the facts supporting that. I assume the IJ would be able to make some new factual findings about supporting going to that second step decision if he thought it was appropriate. But what would that be? We have the fact that there's clearly a hardship here. It's a very sympathetic case. A father who's been involved in the son's care, maybe not physically present to the extent that some fathers, but he's clearly involved, clearly caring. The son clearly suffers in the father's absence, suffers physically, suffers emotionally. What more should the – does the IJ have to find? Other than you make the legal determination as to whether or not that rises to the threshold of hardship. Because the second step decision is not just about the son. It's also about whether the father, whether Mr. Wilkinson merits a favorable exercise of discretion. So you take – you look at all of his personal qualities and, you know, the way the pros and the cons, the way the equities on both sides, and you determine whether – That's what the IJ did. Based on the aggregate of the factors that the court has weighed in this opinion, the court finds the loss of Wilkinson's income is not beyond the ordinary hardship that would be expected when a close family member leaves this country. And that – it's a strain to read that as excluding the non-financial considerations. Because the immigration judge said, well, the court acknowledges the emotional upheaval that naturally accompanies family separation. It does not find that Wilkinson's removal would cause emotional hardship to his family beyond that which would normally be expected from the removal of a parent and provider. So both the emotional part and the financial provider part are in there. So I – this is going back to the first step decision, which is the issue before the court. And I – our main issue with the IJ's language in that paragraph – so again, and I would just like to step back for one second. I'll get to your question, Your Honor, but just to step back for one second. Our main submission is that the IJ's decision is arbitrary. It conflicts with BIA precedent and BIA's unpublished decisions, and it should be reversed. That's a heavy lift, though. That's a very heavy lift. Maybe you'd be better off arguing that despite what has happened here, the IJ – and maybe I'm wrong – still has the discretion to grant cancellation of removal. Well, no, we're definitely arguing that. So let me clarify that again. We are not arguing that this court should order cancellation to be granted because the IJ did not reach the discretionary part. So we're only asking that the hardship determination, which is the eligibility finding, should be reversed. And that the court should say, he's eligible. Now go exercise discretion whether he actually gets that relief. But – Walk me through that. Given the findings we have here, how do we find these eligible, given what the IJ has already found? Because I think that the facts found by the IJ, the established facts, do rise to the hardship standard in the statute. And the way you find that is you look at the – you look at all the facts, and you apply the standard, and you look at the BIA's own application of that standard in unpublished decisions and published decisions, and you say that there's really no way. It's just arbitrary. In a whole bunch of cases, you decide one way. All the cases go in one direction, and then you have this IJ decision that goes in a different direction without any explanation. So that's just classic arbitrary decision-making. So the IJ abused its discretion. Yeah. If you think that that's an arbitrary decision, which is an abuse of discretion, on the hardship determination. We're not asking this court to say anything about the ultimate grant of relief, which is discretionary. But just to go back to Judge Beavis' question, we think you can reverse the hardship determination, but we also think if you don't add a minimum, you should vacate the hardship determination and remand for the IJ to apply the hardship analysis correctly. So here's where Judge Beavis' point gets in, whether the IJ applied the hardship analysis correctly. We think that, aside from our other issues, the hardship analysis was not applied correctly because it was not applied in the aggregate. I know there is that language of... Yeah, it sure sounds like the aggregate to me. But there's also that language where the IJ says... And it's really two things. It's the language and it's the substance. The IJ says... The IJ says it boils down to whether the loss of respondents' previous financial support would constitute an exceptional... Exactly. So this is a classic kind of taking... You're supposed to look at everything in the aggregate, cumulative analysis, totality of the circumstance type test. And you can't take factor by factor isolation, just knock this one down, knock that one down, and then say... Except the IJ said both parent and provider, both emotional and financial. So I don't see how we can argue that this was just a financial analysis. Well, I grant you that he considered things one at a time. The problem is that he didn't consider their cumulative impact and the way they... I'm just not sure what the opinion is supposed to look like. I mean, these are relatively terse decisions. Are we going to say that the IJ can't write these short decisions or the BIA's standard two-page or three-page decisions all need to be reversed for that reason? No. I think that it's very unusual to have this sort of language of... It really all boils down to this one factor. And it's not just the language, it's also the substance. And on these facts, where you have very serious medical and psychological issues, to just say... And one parent who has depression and is in large ways unable to function properly for parts of the month, to say that it all just boils down to financial, that's just baffling, frankly. So to say that the IJ really did apply the proper aggregate analysis on these facts with that language I think is not correct. But I do want to... I understand that there's an issue with the language and I want to back up for a second and just say that our main issue, our main argument is that... Forget about the language. Even if the IJ had properly applied the standard, the decision was incorrect and arbitrary because it violates the BIA's precedents and its unpublished decisions. I see my time has expired. We'll see you at Rebola. Thanks. Thank you. Good morning, Ms. Farrell. Good morning, Your Honors, and may it please the Court, Corey Farrell on behalf of the Attorney General. The only issue left for the Court to decide in this case is whether Petitioner established that his removal would constitute exceptional and extremely unusual hardship to his United States citizen son. Let me go back to Judge Bevis' earlier questions. Is that the only thing we have to resolve or do we need to determine what the standard review is here? The standard of review is the starting point. What is it? The government's position is that the best standard in this case would be substantial evidence. All right, so this is a weird thing. In the abstract, you would think that this is all discretionary, but the Supreme Court says it's not discretionary. The Supreme Court says it's mostly fact, a little bit of law, so there's jurisdiction. But if we were to treat it that way, we would disaggregate the fact law parts. Almost all of what we're doing here is fact. That might argue for substantial evidence. But the history of this is abuse of discretion, but abuse of discretion doesn't fit the Supreme Court's reasoning. So what do we do? And, Your Honor, I think that's what we're here to talk about. The government and Petitioner's counsel agree that the standard is deferential. This court, in an unpublished decision, has recognized that it's deferential, not de novo. That's what Wilkinson told us. So we have these two standards, and as the government notes in its brief, they're probably not that much different when it comes down to it in this case. But because Wilkinson told us that we're looking at primarily factual issues and that the fact finder is in the best position to decide these issues, on this kind of sliding scale, that tips more towards substantial evidence. And, Your Honor, we do have the history where the prior suspension of deportation was reviewed for abuse of discretion. And the Supreme Court rejected any argument that the cancellation hardship determination is discretionary because it lacks that in the opinion of the attorney general language. And I will point you, in the U.S. Bank decision, they cite to Pierce, and in that case, it talks about looking at legislative history, but it also talks about how the language is an important starting point. And here, since we have different language in the cancellation of removal statute compared to the old suspension of deportation statute, that's one of the reasons the government doesn't believe that abuse of discretion is probably the best standard to review this. But as we said, it probably doesn't make a big difference, and the Petitioner's Council, the government, and this Court in unpublished decisions have agreed that it's deferential and not de novo. Is there room here for the IJ, if there were to go back, to look at this, given the factual record that's already there, and determine in the exercise of his discretion, the IJ's discretion, that the circumstances here are sufficient to grant cancellation of removal? If the Court were to send the case back based on the facts that are already found, the immigration judge could possibly review the case and determine that the hardship standard has been satisfied. But here, we have the facts. The immigration judge did a thorough analysis, did what was required of the immigration judge, fully considered the facts presented, the evidence presented, the published case law of the Board, and reached a rational decision. So I would say that it would be unlikely that the immigration judge would then turn around and find that exceptional and extremely unusual hardship had been satisfied, that the standard had been satisfied, because here, there's nothing really left for the immigration judge to do. As I said, he considered all of these facts appropriately and applied the Board's published decisions, which are binding, and reached the hardship determination. What do you make of the IJ's language that we discussed earlier, where he writes, boils down to whether the lawsuit responding to previous financial support constitutes an exceptional, extremely unusual hardship? So does he really, in essence, reduce his decision to that question? No, Your Honor. I believe you have to read the IJ's decision as a whole, and while maybe that one sentence, he could have written it better, I think if you read the entirety of the decision, he considers the emotional impact, the caregiving status, the son's difficulties in school, his medical conditions, and then he talks about the financial conditions. After he's considering all those things, is what I said to the opposing counsel. It's a rare case, because you've got someone who, and assuming that the representation is accurate, that he was in the wrong place at the wrong time when arrested, you've got someone who has been employed, who's been contributing to and supporting his minor U.S. citizen son. The son clearly is impacted adversely. We can argue about degrees of harm by the impact. I guess that's where we are. But it's hard to imagine a situation where you would get, well I can imagine a situation would be a lot more extreme, the impact of removing the father. But I haven't seen many of them, if any of them. Well, and Your Honor, as you note, there is hardship. Hardship is not the standard. The standard is not even extreme hardship as it was under the suspension statute. It's exceptional and extremely unusual hardship. And I would just point you to the board's published decision in matter of JJG. In that case, the applicant had six qualifying relatives. One child had hypothyroidism requiring medication, which the board said may be a serious medical condition. Other children had anxiety disorder. One was in counseling for aggressive and defiant behavior. And in that case, the board said this did not rise to the level of this. That boggles my mind. I'm not sure that's the best case you'd point out. But I think it's illustrative of the high standard that exceptional and extremely unusual hardship requires. There are four published board decisions applying the standard, and only one of the four has been a grant of cancellation of removal. And that's why the board reminds us that it's significantly more burdensome, and that's what the board said in Andenzola, than the prior extreme hardship standard. And here, again, the standard is deferential. The standard of review, whatever that may be, is deferential. And the facts here show that the immigration judge considered everything, weighed and balanced, and it was within his discretion as a fact finder to find that these did not reach exceptional and extremely unusual hardship. The court said it's back to us to do something. I'm not quite sure what that something is or what it looks like, but we're supposed to do something with this. And it still seems to me that if it looks like a fact, walks like a fact, and quacks like a fact, it's a fact. It looks to me like what we're talking about is forcing a round peg into a square hole. We're saying that we have jurisdiction. Well, we totally have jurisdiction because there's a legal issue. I'm still trying to find what that legal issue is, but it looks to me like it's a factual inquiry. It's a mixed question of fact and law. It's a mixed up question. And it's applying the facts to the hardship standard, which, as I've said, is a very, very high standard in this case. And while the immigration judge could have weighed the facts differently, that is not sufficient to reverse the immigration judge's decision. Are there no further questions? Thank you. Thank you, Your Honors. Good morning again. So I'll just make a few quick points on rebuttal. Starting with the standard of review, the McLean case is not making any claim that the IJ erred in its understanding of the law here. Correct? Correct. The application of the legal standard to the fact. So the application, what, de novo review, if there's a mistake of law, no claim of mistake of law, we're either in abusive discretion land or substantial evidence land, correct? Yeah. All right. And I would just, to Chuck McKee's point about, you know, what is the legal question here, the application of a lot of fact is a legal question, as the Supreme Court has said, and it's not that different from when you have summary judgment. You know, you have undisputed facts, and you apply the law to that, to those facts. So I don't think it's so mysterious, and I don't think that it's difficult. We're not differential at all at summary judgment, and here we are deferential. So there's a deferential lens, and that's why we're not arguing de novo review. You know, we're arguing arbitrary decision making. We're arguing just, you know, totally wrong. But we're not, we certainly understand the deferential review. But I'm just pointing out that, you know, the idea of applying a lot of facts as not a factual inquiry is not foreign. I will want to point out that the government does not make any attempt to distinguish these unpublished decisions, and if you look at this court's decision in Shardar and Cruz and other cases, that's very important. Unpublished decisions, when the agency conflicts with unpublished decision, that is grounds for reversal. That's abusive discretion. I also want to point out that, you know, my colleague on the government's side argued that this hardship standard is extremely severe. The BIA in precedential decisions in the Ressinghaus case said that the hardship standard is not so restrictive that only a handful of applicants qualify. And they said that, for instance, a handful would be someone as a child with a serious medical condition, which is exactly what we have here. And that's a factual finding by the IJ that cannot be controverted in this court. So this is one of the handful, but the standard is not so restrictive that it's only a handful. You know, the statute allows for 4,000 grants a year. That's people who satisfy the hardship standard and satisfy the discretionary component, the second step. So we're not talking about unicorns that barely exist. This is a very common form of relief, a very important form of relief. And you can see from the BIA's own cases, the unpublished decisions especially, how the BIA actually applies this standard in practice. Those cases are indistinguishable. The government makes no attempt to distinguish them. And we think that that's grounds for arbitrary decision-making. I also want to emphasize, and this is something that the government's counsel just ignores, but the facts, it's not just, you know, it's not just financial, medical, and psychological hardship separately. Those facts weave together and they are mutually aggravating and mutually reinforcing in a way that is greater than the sum of its parts. The child's trauma from the deportation is harder than usual to manage when his mother is battling her own mental health issues and is unable to, is not really holding it together. Well, that does seem to be maybe a hook that gets it into that, whatever the test is, gets it into that arena because of the situation with the mother. But the IJ considered that. The IJ never really, the IJ, you know, mentioned it in factual recitation, but he never considered how severe that is and how severe it, how that impacts on the financial hardship and how the financial hardship reinforces the psychological hardship. But because of the presence of the grandmother, I assume, it would be different if she wasn't there, but she's there. She's there, but, you know, the IJ did not say that, therefore, it's all, you know, fine. You don't need a parent, you know. On the contrary, in the facts, the established facts, all the testimony that was fully credited by the IJ, the established facts show that the child really, really needed his dad, really needs his dad, and that the psychological hardship would be reinforced by the financial hardship and by the mother's own internal struggles that make it harder for her to take care of, you know, as a sort of backstop to take care of her child alone, and the medical issues, you know, this very serious medical condition, which is also similar to the unpublished decision of LABC. So I think all of those together, we'd ask this court to reverse, and at a minimum, it should vacate and remand for further proceedings. Thank you very much.